AES TECHNOLOGY SYSTEMS, INC.,
Plaintiff-Appellee,

v.

COHERENT RADIATION,
Defendant-Appellant.

No. 77-1565.

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1978.

Decided Aug. 25, 1978.

As Modified on Denial of Rehearing
Sept. 20, 1978.

---

James A. Christman, Chicago, Ill., for defendant-appellant.

Richard L. Reinish, Chicago, Ill., for plaintiff-appellee.

Before SWYGERT, Circuit Judge, MOORE, Senior Circuit Judge,* and BAUER, Circuit Judge.

* Senior Circuit Judge Leonard P. Moore of the United States Court of Appeals for the Second Circuit is sitting by designation.

MOORE, Circuit Judge.

Defendant-appellant, Coherent Radiation ("Coherent") appeals from a judgment of $73,923.40 entered in favor of plaintiff-appellee AES Technology Systems, Inc. ("AES"), in an action for breach of warranty by Coherent arising out of AES's purchase of a CR–5 Argon Laser ("Laser") from Coherent, because the Laser did not operate at the specified power output of 150 milliwatts ("mw") in the ultraviolet spectrum. Coherent is a California corporation with its principal place of business in Palo Alto, California. AES is a Delaware corporation with its principal place of business in Illinois. Jurisdiction is provided by 28 U.S.C. § 1332.

The facts were in dispute as evidenced by the conflicting testimony concerning statements and representations made by employees of both parties. AES manufactures, among other things, document retrieval and printing devices. Coherent manufactures lasers. In late 1973 AES, interested in developing a device to make high speed copies on paper from computer generated microfilm, obtained exclusive rights from Appleton Paper Company, Inc. for a special light sensitive paper ("HLH paper"). Coherent employed Richard Weaver, an electrical engineer, to work on the project with Aaron Aronson, a consultant. They reported to Ronald Wochinski, AES's Manager of Engineering.

In order to transfer the image from the microfilm to the HLH paper, a source of light was needed to create a latent image on the HLH paper, which would be developed through the application of heat. Weaver met with Augustus Bidwell, Coherent's Midwest Regional Sales Manager, in February 1974 to discuss the possibility of using a Coherent laser as a light source. After discussions with Bidwell, Weaver visited Coherent's Palo Alto laboratory and tested the HLH paper with Coherent's lasers, including a CR–5 Argon Laser. The CR–5 Argon Laser was able to produce images on the HLH paper. On Weaver's return, Bidwell met with Weaver, Wochinski, and perhaps Martin Abrams, Board Chairman of AES. Bidwell was told that AES intended to use a laser to produce hard copies from microfilm and Bidwell informed AES that the CR–5 Argon Laser was capable of producing 150 mw in the ultraviolet mode, as specified in Coherent's catalogue.

On March 9, 1974, Bidwell gave AES a quotation of $16,635.00 for the Laser and related equipment. On March 22, 1974, AES sent Coherent a purchase order for the equipment.[1] The Laser was delivered on May 13, 1974 and a few days later Bidwell supervised the installation, checkout and initial start-up. The Laser appeared to perform satisfactorily. Early in June, 1974, Weaver telephoned Bidwell and informed him that the power output had fallen below specifications. Joseph Bruno, Midwest Service Representative of Coherent, visited AES and inspected and repaired the Laser. Subsequently, the Laser continued to suffer power fall-off problems. On June 17, 1974, Weaver drafted a letter to Coherent regarding the Laser's problems, but he never sent it to Coherent. Instead, he did communicate his unhappiness to Coherent by telephone. Also in June, Bidwell went to AES to inspect the Laser and readjust the optics. He observed that the Laser would not maintain a continuous power output of 150 mw. On June 26, Bruno made another service call. He noticed an explosion and smoke emanating from the Laser support equipment. He serviced the Laser and it approached 200 mw in the ultraviolet mode after his service. On September 25, 1974, Bruno made another service call to AES, and he again noted the low power output on the Laser.

In the fall of 1974, Bidwell attended a meeting at AES concerning the Laser's low power output. The parties disagreed as to what transpired at this meeting. Bidwell indicated that Coherent would replace the tube (which seemed to be a cause of the

---

1. AES also purchased from Tropel (a Coherent subsidiary) related optical accessories for $11,500 and special scanner lens for $2,500.

problem) as often as required, but he testified that "one of the gentlemen said to me that it would not be convenient to replace the tube. They wanted to know about a development that they had heard about with higher power Argone [sic] lasers". Trans. 335. However, AES presented testimony that Bidwell indicated that replacing the tube would not solve the problem, but the solution would have to wait until a new type of tube became available. Abrams testified:

He said they were trying everything possible to correct this problem. He went into a Brewster window, things of this nature, they were working on a new tube, but we were hearing the same story for quite a number of months already.

\* \* \* \* \* \*

Q. Did Mr. Bidwell make any other statements?

A. Yes. He kept talking, that if we would just be patient, you know, we would have new tubes that would make this machine operate now, this I heard myself, I was there.

Q. What did you direct AES to do as a result of these statements?

A. There was not much I could do. I couldn't send the machine back because they couldn't fix it. They could not fix it within my factory.

\* \* \* \* \* \*

Q. Did you continue the project at this point and if so, to what extent?

A. Well, we continued around the things that we couldn't do. We worked on the logic within the machine, worked on our transport systems, hoping they would come up with something.

They kept assuring us that they were close, they were coming up with it, they had it solved. As a matter of fact, they said something about new material. I don't know what this new material was, but this was supposed to solve everything. Trans. 162–64.

Nothing further occurred between the parties with regard to the Laser until March 12, 1975 when Wochinski called Coherent and notified it that AES wanted a refund on its purchase price of the Laser and related equipment. About this time, AES ceased all work on the project and crated the Laser to put it into storage.

This litigation was commenced shortly thereafter on May 2, 1975. The district court, after a three-day bench trial, determined that Coherent had breached its warranty and awarded AES damages for direct losses, other equipment expenses, and salaries and wages totaling $73,923.40. The court did not award recovery for contemplated profits.

Coherent argues that the claim was barred by the express terms of the warranty governing the transaction which guaranteed only that the Laser was free of defects in materials and workmanship and which limited remedies to repair or replacement of defective parts. It contends that the district court's determination that Coherent had breached its warranty was clearly erroneous; that the award of consequential damages was contrary to the agreement between the parties; that, if consequential damages were available, AES failed to mitigate damages; and that the record failed to support the amount of consequential damages awarded by the district court. Coherent also argues that AES failed timely to notify Coherent about the existence of defects. AES, on the other hand, contends that the district court was correct in determining that Coherent breached its warranty; that the limited remedy "failed of its essential purpose"; and that the district court was justified in awarding all damages incurred.

I

Coherent received adequate notice from AES of its problems. The warranty states that "[a]ll claims under the warranty must be made promptly after occurrence of the circumstances giving rise thereto." This is a mere rewording of the provisions of § 2–607 of the Uniform Commercial Code ("U.C.C.") which provides that a buyer

must notify the seller of a breach within a reasonable time.[2] The U.C.C. states:

> (3) Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . .

 Coherent first provided notice of the malfunction a few days after delivery, and problems existed continuously after that time. This initial notice was sufficient to make Coherent aware that the transaction had not been satisfactorily completed. The evidence presented concerning the repeated difficulties with the Laser and testimony by AES witnesses that they were expecting a new tube to be developed provided sufficient support for AES to wait until March 12, 1975 to make a final demand for a return of its money.

## II

 The U.C.C. permits a seller to exclude or modify warranties, U.C.C. § 2–316, and to limit remedies for breach of warranty, U.C.C. §§ 2–316(4) and 2–719.[3] The Laser was sold under an express limited warranty. There is no evidence that the warranty was the subject of negotiation. However, the warranty was at least included on the reverse side of Coherent's bid form, on the reverse side of Coherent's invoice form, and on a separate warranty card packed with the Laser. The warranty stated:

> Seller warrants to original Buyer each item manufactured by it to be free from defects in material and workmanship for a period of time and under such conditions as specified in Seller's warranty for the individual product, or for twelve (12) months from delivery if a warranty for the individual product is not specified. Major sub-systems manufactured by other firms but integrated into Seller's system are covered by the original manufacturer's warranty. Seller's liability under valid warranty claims is limited to repair or replacement at Seller's plant or Buyer's location, all at the option of Seller. THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL, OR IMPLIED, AND SHALL BE BUYER'S SOLE REMEDY AND SELLER'S SOLE LIABILITY ON CONTRACT OR WARRANTY OR OTHERWISE FOR THE PRODUCT. SELLER DISCLAIMS ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE.
>
> All claims under warranty must be made promptly after occurrence of circumstances giving rise thereto, must be received within the applicable warranty period by Seller and shall be subject to the terms and conditions stated herein.[4]

2. This case is governed by the applicable provisions of the Uniform Commercial Code. The agreement between the parties provided that California law would apply to all disputes under the agreement. However, at trial the parties agreed that the California and Illinois statutes were identical. Trans. 424–25. For this reason references will be made to the specific sections of the U.C.C. rather than to individual statutes.

3. The U.C.C. provides in § 2–316:
 (4) Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2–718 and 2–719).
 Section 2–719 provides:
 (1) Subject to the provisions of subsections (2) and (3) of this section and of the preced-

ing section on liquidation and limitation of damages,
 (a) the agreement may provide for remedies in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and
 (b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

4. The warranty packed with the Laser is slightly different from the others in that it refers to "conditions as specified in Coherent Radiation's data sheet for that product" instead of "conditions as specified in seller's warranty for the individual product". This is not a substantive distinction.

No warranty was provided that the Laser would image the HLH paper. However, the warranty to be free from defects in materials and workmanship was to the effect that the Laser would perform to specifications. Coherent's catalogues containing laser specifications and the representations made by Bidwell created a warranty that the Laser was capable of producing 150 mw in the ultraviolet mode. This is the only warranty on which AES can rely.

 Although under U.C.C. § 2–719 a seller generally may limit the remedies available under a warranty, circumstances may arise which cause the limited remedy to "fail of its essential purpose." As stated in that section:

> (2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act.

The circumstances under which a remedy may fail are not delineated in the U.C.C. However, the purpose behind the rule is provided in the Official Comment:

> [I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract. . . . [U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article. U.C.C. § 2–719, Comment 1.

By limiting the warranties available and the remedies under the warranties, parties are able to provide a consensual allocation of risk in accordance with sound business practices.[5] There is no indication here of unconscionability or disparity in bargaining power between the parties. While the terms of warranty and limitation of remedy were part of Coherent's forms and drafted by Coherent for its benefit, AES cannot gainsay that it is not bound by the terms. However, no contract can deprive the parties of minimum adequate remedies under the U.C.C. Courts must peer into the particular factual circumstances of each case to determine if indeed the contract met its purpose.

 In a case such as this the warranty and remedy, while distinct, go hand-in-hand. In a properly functioning system, a defect is noticed (a small breach of warranty) and the repair or replacement is quickly made (the remedy). Within a reasonable period of time and after a reasonable number of failures, the steady-state performance should be reached whereby the product performs as specified. If after repeated efforts by a seller to place a product into warranted condition, and the seller cannot or will not do so, the remedy of repair or replacement may be deemed to have failed of its essential purpose and other remedies under the U.C.C. may be called into play.

At some point after purchase of the Laser, Coherent should have placed the Laser into workable condition according to specifications, which it did not.[6] The purchase of a commercial laser, although today considered a product of high technology, is not

---

5. The purpose of an exclusive remedy of replacement or repair of defective parts, whose presence constitute a breach of express warranty, is to give the seller an opportunity to make the goods conforming while limiting the risks to which he is subject by excluding direct and consequential damages that might otherwise arise. From the point of view of the buyer the purpose of the exclusive remedy is to give him goods that conform to the contract within a reasonable time after a defective part is discovered. When the warrantor fails to correct the defect as promised, within a reasonable time he is liable for a breach of that warranty. *Beal v. General Motors Corporation*, 354 F.Supp. 423, 426 (D.Del.1973).

6. It is not necessary that the failure be willful or negligent. *Soo Line Railroad Company v. Fruehauf Corporation*, 547 F.2d 1365, 1371 n. 7 (8th Cir. 1977). It is sufficient to result in a breach of warranty if after a reasonable period, the seller fails to correct the problems encountered.

that different from a purchase of what today is considered a more mundane technological product (even though no less complex)—the automobile. The Fifth Circuit, in *Riley v. Ford Motor Company,* 442 F.2d 670 (5th Cir. 1971), in a case involving the retail sale of an automobile with a limited warranty and remedy limited to repair or replacement, held that the jury did not unreasonably find that the warranty had failed of its essential purpose after repeated unsuccessful efforts to repair the car. The court stated:

> [A]t some point after the purchase of a new automobile, the same should be put into good running condition, that is, the seller does not have an unlimited time for the performance of the obligation to replace and repair parts. * * * This is not more than saying that at some point in time, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free from defect. *Id.* at 673 n. 5, *citing General Motors Corp. v. Earnest,* 279 Ala. 299, 302, 184 So.2d 811, 814 (1966).

The evidence presented here was such that the trial judge was not in error in determining that the machine did not perform to specifications. AES experienced trouble with the Laser almost from the beginning, and repeated efforts by Coherent were unsuccessful in bringing the Laser to warranted specifications for other than short periods of time. Coherent sent its service technician to AES on three different occasions to repair the Laser. Each time after the repair the Laser performed to specifications for a short period of time and then suffered a power fall-off. Bidwell, Midwest Regional Sales Manager, also visited AES on several occasions to inspect the machine and attempted to correct the problems himself. Evidence was also presented that Bidwell represented in the fall meeting that a new type tube would correct the problem, and that a new type tube was under development and would be ready in the near future. No newly designed tube was ever supplied. At the time of the final communication between AES and Coherent, in March 1975, approximately 10 months had passed since the delivery of the Laser and during this period the Laser had only sporadically performed as specified and warranted. We find the evidence sufficient to support the district court's determination that Coherent had breached its warranty and that the remedy of repair or replacement had failed of its essential purpose.[7]

### III

When a contract provision limiting remedies fails of its essential purpose, "remedy may be had as provided in this Act." U.C.C. § 2–719(2). Section 2–714 allows recovery for the direct damages incurred. Also, "[i]n a proper case incidental and consequential damages under the next section may also be recovered." U.C.C. § 2–714(3).[8] The next section [2–715] provides in part: "(2) Consequential damages resulting from the seller's breach include (a)

---

**7.** It makes no difference here that the transaction was between commercial parties and did not involve a consumer. We are not dealing with unconscionability or disparity of bargaining power, but whether a party was deprived of a substantial benefit of the bargain. Several courts have found a contract to have failed of its essential purpose in commercial settings and applied § 2–719(2). *See, e. g., Soo Line Railroad Company v. Fruehauf Corporation,* 547 F.2d 1365 (8th Cir. 1977) (sale of 500 covered hopper freight railroad cars); *Beal v. General Motors Corporation,* 354 F.Supp. 423 (D.Del. 1973) (extra-heavy tonnage diesel tractor for trucking); *Jones & McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39 (N.D.Ill.1970) (automated machinery and equipment); *Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 297 N.Y.S.2d 108, 244 N.E.2d 685

(1968) (latent defect in yarn); *Adams v. J. I. Case Company,* 125 Ill.App.2d 388, 261 N.E.2d 1 (1970) (crawler tractor for contracting business).

**8.** Section 2–714 provides:

> (1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
>
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted,

any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . . ."

▆▆▆ The question is whether this is a "proper case" for the awarding of consequential damages. The purpose of § 2–719(2) is to prevent the buyer from being deprived of "the substantial value of the bargain" and to provide the buyer with "minimum adequate remedies." In other factual situations some courts have awarded consequential damages, when a remedy failed of its essential purpose, in the face of prohibitions in the contract against consequential damages. *See, e. g., Soo Line Railroad Company v. Fruehauf Corporation,* 547 F.2d 1365 (8th Cir. 1977); *Koehring Company v. A. P. I., Incorporated,* 369 F.Supp. 882 (E.D.Mich.1974); *Jones & McKnight Corp. v. Birdsboro Corp.,* 320 F.Supp. 39 (N.D.Ill. 1970); *Adams v. J. I. Case Company,* 125 Ill.App.2d 388, 261 N.E.2d 1 (1970). However, we reject the contention that failure of the essential purpose of the limited remedy automatically means that a damage award will include consequential damages.[9] An analysis to determine whether consequential damages are warranted must carefully examine the individual factual situation including the type of goods involved, the parties and the precise nature and purpose of the contract. The purpose of the courts in contractual disputes is not to rewrite contracts by ignoring parties' intent; rather, it is to interpret the existing contract as fairly as possible when all events did not occur as planned. As this court stated in *V–M Corp. v. Bernard Distributing Co.,* 447 F.2d 864, 869 (7th Cir. 1971):

> Moreover, we are not persuaded that Section 2–719(2) otherwise requires the negation of the specific limitations of the

contract. Section 2–719 was intended to encourage and facilitate consensual allocations of risks associated with the sale of goods. This is particularly true where commercial, rather than consumer sales are involved. Even where the defects of the goods cause substantial difficulties to those involved in wholesale and retail distribution, Section 2–719(2) need not automatically require disregard of the particular limitations upon liability specified by the contracting parties.

The project, on which AES was engaged at the time of the Laser purchase, was the manufacture of a printer which could produce at high speed, images (copies) on HLH paper for which, as previously stated, AES had exclusive rights. The Laser was but a component (although apparently important) part of the AES project on which some of its employees were working. In other words, the development of such a printer was a project of AES—not a joint venture of Coherent and AES. In pre-contract negotiations AES had thought that a CR–5 Laser with a power output of 150 mw could produce sufficient light for its purposes because initial experiments at that power had produced images. There was no proof of speed or duration tests which were incorporated into the contract and there was no warranty by Coherent as to the performance of any AES HLH printer with a CR–5 Laser. The only warranty was that the Laser would operate at 150 mw in the ultraviolet mode. The Laser failed to consistently produce the warranted power—hence, breach and liability.

▆▆▆ The intent of the parties, as gleaned from the express provisions of the contract and the factual background, was for AES to bear the risk of the project. Here the awarding of damages for the

---

unless special circumstances show proximate damages of a different amount.

 (3) In a proper case any incidental and consequential damages under the next section may also be recovered.

**9.** Here it makes no difference that the clause limiting damages did not refer specifically to consequential damages. The consequential damages were limited as implied in the section stating:

THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, ORAL, OR IMPLIED, AND SHALL BE THE BUYER'S SOLE REMEDY AND SELLER'S SOLE LIABILITY ON CONTRACT OR WARRANTY OR OTHERWISE FOR THE PRODUCT. . . .

942

breach of warranty and incidental damages provides the "minimum adequate remedies" mandated by § 2–719(2), while maintaining the commercial allocation of risk determined by AES and Coherent. *See American Electric Power Company, Inc. v. Westinghouse Electric Corporation,* 418 F.Supp. 435(a), (S.D.N.Y.1976).[10] Furthermore, under U.C.C. § 2–715(2) (a), AES was obligated to mitigate damages, which it failed to do. There was proof that AES could have secured another laser from a different manufacturer. This might have mitigated any damage which had occurred. The question of "whether AES was required to buy a new laser in order to mitigate" is a question of fact to be determined by the trial court with such other relevant items as there may be on remand.

The level of damages is a question of fact, the answer to which cannot be determined from the record on appeal and the schedule of damages given by the court below. For this reason we remand for a redetermination of damages. However, the trial court in its opinion, after awarding the full purchase price of the Laser (asserted to be in AES's possession in storage) added four items including a large amount ($14,185.00) for equipment under the category of "Direct Losses," ten items as "Other Equipment Expenses," and two items as "Salaries and Wages" listed under "Employees Working Only on HLH Project" aggregating $24,539.29 and under "Other Employees" aggregating $10,834.43. A breach of warranty as to the Laser does not make Coherent responsible for AES's payroll allocated to its HLH project—particularly in view of AES's apparent ability to acquire a laser which would have supplied its power requirements. Problems with the Laser did not prohibit AES employees from working on other projects nor did the problems delay work on the project itself. While the Laser problems existed, AES continued to work on other areas of the project:

[W]e continued around the things that we couldn't do. We worked on the logic within the machine, worked on our transport system, hoping they would come up with something. Trans. 164.

In no event should damages be awarded for these past salaries of those involved in the project.

As to the other items listed as damages, there is insufficient proof in the record to comment on their propriety or their relation to the breach of warranty. The purchase price of the Laser less salvage value should be recoverable. Additional damages would include purchase price less salvage value of auxiliary equipment and installation charges only if the current equipment and installed facilities were not compatible with a replacement laser or otherwise usable on the HLH project.

AFFIRMED as to liability; REMANDED for a redetermination of damages.

---

10. Section 2–719(3) provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." As stated, *supra* n. 7, the bargain itself was not unconscionable at the time it was entered. Excluding consequential damages now is not unconscionable. There was no indication of a willful breach of the warranty, by Coherent, in order to delay the project, and other remedies provide the minimum adequate remedy to which AES is entitled.