**KKO, INC., et al., Plaintiffs,**

v.

**HONEYWELL, INC., Defendant.**

**No. 77 C 2351.**

United States District Court, N. D. Illinois, E. D.

May 4, 1981.

Max & Herman Chill, P.C., Chicago, Ill., for plaintiffs.

Norman J. Barry, Jr., Baker & McKenzie, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Defendant Honeywell, Inc. ("Honeywell") formerly sold parts to plaintiffs KKO, Inc. ("KKO") and Keating of Chicago, Inc. ("Keating"), to be incorporated into electric deep fat fryers ("fryers") manufactured by plaintiffs for sale to commercial establishments. Plaintiffs now sue Honeywell for breach of warranty and fraudulent misrepresentation in connection with Honeywell's sales. Counts III and VIII of plaintiffs' Amended Complaint (the "Complaint") seek direct and consequential damages for the alleged breach of warranty. Honeywell has moved for summary judgment as to any consequential damages, relying on a contract provision that expressly precludes such relief. Plaintiffs claim that provision is ineffective because (1) Honeywell's warranty "failed of its essential purpose" and (2) the provision is unconscionable. For the reasons stated in this memorandum opinion and order Honeywell's motion is denied, but this Court concurs in Honeywell's legal position as to the scope of application of the unconscionability defense.

### Facts

KKO and Keating are related corporations engaged in the business of manufacturing, designing and selling ovens, fryers and other cooking equipment to food-related businesses. KKO is one of the largest manufacturers and Keating one of the largest distributors of fryers in the United States.

Until 1972 KKO purchased from Honeywell electrical contactors ("contactors") for installation in their bun toasters and ovens. Contactors regulate the flow of electricity through such cooking units by use of magnetic pole faces ("E and I magnets"). During operation of a cooking unit the magnets are normally in contact with each other, closing the circuit so that electric current flows through the unit. When the unit reaches a preset temperature the magnets automatically disengage, breaking the electrical circuit until the temperature again falls below the designated level. At that

point the circuit again closes and the electrical flow is restored.

In 1972 plaintiffs began manufacturing and selling fryers. Like the bun toasters and ovens, fryers were designed to use contactors as temperature controls. Plaintiffs determined that the Honeywell contactors used in bun toasters and ovens were also usable without alteration in fryers, and they began to purchase contactors from Honeywell for their new product. Individual purchase orders sent to Honeywell by KKO stated the contactors would be used on commercial cooking equipment, but at least initially Honeywell was not specifically informed that they would be used in fryers. Upon receiving each purchase order Honeywell sent KKO an "acknowledgement" (the "contract"), on the back of which was printed the following terms:

1. GUARANTEE. The Company warrants all equipment manufactured by it or bearing its nameplate to be free from defects in workmanship and materials, under normal use and service, as follows: (a) Equipment not installed by the Company which is received, transportation prepaid, at the factory originating shipment (i) within twelve months after date of manufacture, or (ii) within twelve months after date of installation, as evidenced by a certification by the installer, and is found by the Company's inspection to be defective in workmanship or materials within the guarantee, will be repaired or replaced, at the Company's option, free of charge and returned transportation prepaid. (b) Equipment installed by the Company, or under the direct supervision of the Company, which within twelve months after date of installation, is found by the Company inspection to be defective in workmanship or materials with the guarantee, will be repaired or replaced, at the Company's option, free of charge. If inspection by the Company does not disclose any defect covered by this guarantee, the equipment will be repaired or replaced and the Company's regular service charges will apply. WITH EXCEPTION OF THE TWELVE MONTH WARRANTY SET FORTH ABOVE, THE COMPANY MAKES NO EXPRESS WARRANTIES, NO WARRANTIES OR MERCHANTABILITY AND NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION OF THE FACTS HEREOF. In no event will the Company be responsible for consequential damages of any nature whatsoever.

Until February 1973 Honeywell had used Speedfam 205 oil as the "lapping compound" in its contactors. Lapping compounds are lubricants that facilitate "grinding down and making smooth" the E and I magnets, allowing the contactor to function properly. In mid-February 1973 Honeywell began to mix a new lapping compound, Speedfam 210 oil, with Speedfam 205. Next month, when its supply of the 205 compound was exhausted, Honeywell began to use only the 210 compound.

Honeywell assumed the two compounds were functionally interchangeable. But because of the manner in which Speedfam 210 interacted with the magnets and with silicon particles and iron filings in the chambers of the contactors, it produced a sticky adhesive substance that could (and on occasion did) cause the contactor to stick in the "power on" position. Temperature in the fryer would then escalate beyond the designated level and create a serious fire hazard.

Sales to plaintiffs continued without interruption until November 1973, when Honeywell discovered that contactors bearing the manufacturing date codes CW through KW (corresponding to the period March 1973 to November 1973) were thus potentially defective. Honeywell then commenced a nationwide recall of the contactors in which Speedfam 210 had been used, allegedly 200,000 in number, including those purchased by plaintiffs.[1] Honeywell

---

1. There is a dispute as to whether Honeywell informed purchasers—specifically plaintiffs—of the real reason for the recall. Honeywell maintains it informed plaintiffs of the lapping compound problem in January 1974, when it initiated the recall. Plaintiffs claim they were told that the problem was one "in the wiring,"

obtained a list of plaintiffs' customers and replaced the existing contactors with completely new models.

Plaintiffs contend they too were promised new contactors in exchange for the models still in their possession (and therefore unused). However, Honeywell repaired rather than replaced the unused contactors by disassembling them and cleaning the E and I magnets with a vapor degreaser. Honeywell deleted the original manufacturing code date on each repaired contactor and replaced it with a new one. In addition, Honeywell apparently "cleaned" a large quantity of the E and I magnets from used contactors and used them in "new" contactors later offered for sale. ·

Plaintiffs continued to purchase contactors from Honeywell. Then in late 1974 they complained that a number of contactors not subject to Honeywell's recall campaign were malfunctioning. Honeywell examined certain of those contactors and determined that the malfunctions were attributable to the seepage of cooking grease into ·the contactors. It therefore concluded the malfunctions were caused by "an incorrect application rather than a product defect" and that those malfunctions were accordingly not covered by its warranty.

Plaintiffs assert that the defective contactors are those in which recalled, rather than new, E and I magnets were used and that the defects are attributable to the fact that Honeywell's cleaning process failed to "decontaminate" those magnets. As Honeywell concedes, the cleaning process did not remove all Speedfam 210 from the magnets. However Honeywell contends that the residue "was insufficient to cause a failure in a proper application of the contactor." Plaintiffs claim the residue migrates to the surface of the magnets, causing the same problem that led to the recall. Furthermore they allege that Honeywell knew or plainly had reason to know that the cleaning process would be ineffective.

so that they did not learn of the real defect until later.

**2.** Statutory references in this opinion are to Ill.Rev.Stat. ch. 26 (the "Code"), Illinois' ver-

When Honeywell refused to repair the malfunctioning contactors plaintiffs commenced their own recall program to replace all Honeywell contactors in their fryers. In this action they seek damages occasioned by the contactor malfunctions, including lost profits and consequential expenses allegedly incurred because of their own recall program.

### Plaintiffs' Legal Theories

Paragraph 1 of the reverse side of the contract includes three provisions relevant to Honeywell's motion. First it warrants the contactors to be "free from defects in workmanship and materials, under normal use and service..." (the "warranty"). Second it limits a purchaser's "remedy" for any such defect to repair or replacement by Honeywell (the "limited remedy clause"). Finally it states, "In no event will the Company be responsible for consequential damages of any nature whatsoever" (the "exclusion clause").

Thus the unambiguous contract language supports Honeywell's assertion that it cannot be held responsible for any consequential damages under the warranty. Plaintiffs do not dispute the general enforceability of such limited remedy and exclusion provisions under Illinois law.[2] Plaintiffs contend, however, that the exclusion clause is invalid under either of two theories:

1. In this instance the limited remedy "failed of its essential purpose" and therefore under Code Section 2–719(2) plaintiffs may obtain consequential damages.

2. Honeywell's exclusion clause is unconscionable and thus unenforceable under Code Section 2–719(3).

*1. Section 2–719(2): Failure of Essential Purpose*

Section 2–719(2) states:

sion of the Uniform Commercial Code. Both sides have assumed that Illinois law applies in this diversity action.

Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in the Act.

Under Section 2–714(3) "remedy . . . as provided in the Act" includes "in a proper case any incidental or consequential damages." Plaintiffs reason that where the limited remedy of a contract "fails of its essential purpose," consequential damages are recoverable notwithstanding an otherwise valid exclusion clause.[3]

Honeywell counters that failure of essential purpose under Section 2–719(2) does not permit recovery of consequential damages in the face of an express exclusion clause. Such clauses are specifically authorized by Section 2–719(3) subject to the condition that they are not unconscionable. Honeywell reasons that the validity of any such clause must be assessed against the unconscionability standard of Section 2–719(3) and that standard alone. In short Honeywell contends that Sections 2–719(2) and (3) are separate and distinct, so that an enlargement of plaintiffs' remedial alternatives via the former does not override a limitation of remedy valid under the latter.

Both plaintiffs and Honeywell seek to draw support from a significant number of decisions in other jurisdictions [4] interpreting the Uniform Commercial Code. But in this diversity action the Court must decide all substantive questions in accordance with Illinois law under the seminal case of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Honeywell cites two decisions involving Illinois law in support of its position. In *V–M Corp. v. Bernard Distributing Co.*, 447 F.2d 864 (7th Cir. 1971) counterclaimant, an electronic equipment distributor, sought direct and consequential damages from plaintiff for supplying it with allegedly defective goods. Plaintiff invoked limited remedy and exclusion clauses to defeat counterclaimant's consequential damage claim. Counterclaimant argued that because the limited remedy failed of its essential purpose under Section 2–719(2) the exclusion clause was ineffective. Our Court of Appeals held that the limited remedy had not failed its essential purpose. However the Court also stated (447 F.2d at 869):

Moreover, we are not persuaded that Section 2–719(2) otherwise requires the negation of the specific limitations of the contract. Section 2–719 was intended to encourage and facilitate consensual allocations of risks associated with the sale of goods. This is particularly true where commercial, rather than consumer sales are involved. Even where defects of the goods cause substantial difficulties . . . Section 2–719(2) need not automatically require disregard of the particular limitations upon liability specified by the contracting parties. Here we cannot say that the defects in the quality of [plaintiff's] . . . goods caused a failure of consideration for the . . . agreement which would justify altering the particular allocation of these costs by making the manufacturer the insurer of distributor profits and extraordinary expenses.

*AES Technology Systems, Inc. v. Coherent Radiation*, 583 F.2d 933 (7th Cir. 1978) is the second "Illinois case" [5] on which Honey-

---

3. For purposes of Honeywell's summary judgment motion the Court must view the case as if the limited remedy provided in the contract in fact did "fail of its essential purpose." Submissions by both sides indicate that material questions of fact pertaining to that issue plainly remain unresolved, and of course all reasonable factual inferences must be drawn in plaintiffs' favor. Thus Honeywell's argument at this juncture can prevail only if "failure of essential purpose" of the limited remedy is immaterial to its position. This Court expresses no opinion as to the factual burden plaintiffs must satisfy to prove a failure of "essential purpose."

4. In support of plaintiffs' position, such cases as *Soo Line R.R. Co. v. Fruehauf Corp.*, 547 F.2d 1365 (8th Cir. 1977) (Minnesota law), and in support of Honeywell's position such cases as *Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir. 1980) (New Jersey law).

5. *AES Technology* was a diversity action in which the Court never expressly stated what state's law governed. Statutory citations were made to the Uniform Commercial Code rather

well relies. Plaintiff sued for breach of warranty respecting a laser it had purchased from defendant and sought direct and consequential damages. Defendant asserted that a limited remedy clause precluded such relief, but plaintiff responded that the clause had failed its essential purpose under Section 2–719(2). Although the parties' contract did not contain an express provision excluding consequential damages the Court found such a condition to be implicit in the fact that the repair and replacement warranty was expressly exclusive (583 F.2d at 941 n.9).

Our Court of Appeals held that the limited remedy clause had failed its essential purpose but, quoting the passage from *V–M Corp.* set out above, also held that consequential damages were non-recoverable. It went on to say (583 F.2d at 941):

> [W]e reject the contention that failure of the essential purpose automatically means that a damage award will include consequential damages. An analysis to determine whether consequential damages are warranted must carefully examine the individual factual situation involved.... The purpose of the courts in contractual disputes is not to rewrite contracts by ignoring parties' intent; rather, it is to interpret the existing contract as fairly as possible when all events did not occur as planned.

In response plaintiffs cite *Adams v. J. I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1 (4th Dist. 1970) in support of their position. In *Adams* plaintiff purchased a tractor from defendant and sued for the cost of repair and lost earnings after the tractor broke on several occasions. Defendant relied in part on limited remedy and exclusion clauses, quite similar to those in this case, in contesting plaintiff's claim. First the Appellate Court determined that defendant had unreasonably and wilfully failed to meet its repair or replacement obligation under the warranty and therefore that the

limited remedy clause had "failed of its essential purpose" under Section 2–719(2). Notwithstanding the express exclusion clause, the Court then held that consequential damages were recoverable (125 Ill. App.2d at 402–03, 261 N.E.2d at 7–8):

> The limitations of remedy and of liability are not separable from the obligations of the warranty. Repudiation of the obligations of the warranty destroys its benefits. The complaint alleges facts that would constitute a repudiation by the defendants of their obligations under the warranty, that repudiation consisting of their wilful failure or their careless and negligent compliance. It should be obvious that they cannot at once repudiate their obligation under the warranty and assert its provisions beneficial to them.

There is obvious incongruity between *V–M Corp.* and *AES Technology Systems* on the one hand and *Adams* on the other. Honeywell asserts that the Seventh Circuit decisions are dispositive of its motion. But in a diversity action that would be true only if those decisions accurately mirror *Illinois* law. *Erie* requires this Court to decide state substantive law questions in the same way that its state trial judge counterpart sitting in the same location would. *National Can Corp. v. Whittaker Corp.*, 505 F.Supp. 147, 148–49 n.2 (N.D.Ill.1981); *Instrumentalist Co. v. Marine Corps League*, 509 F.Supp. 323, 339 (N.D.Ill.1981).

Under Illinois law a trial judge in the First Appellate District is *bound* by the decisions of all Appellate Courts unless two or more districts are in conflict. *People v. Thorpe*, 52 Ill.App.3d 576, 579, 10 Ill.Dec. 351, 354, 367 N.E.2d 960, 963 (2d Dist. 1977). In contrast, federal Court of Appeals decisions applying state law do not *bind* a state trial court, for federal appellate courts engage only in the same process as this Court must: "acting" as a state trial court. Accordingly to the extent that *Adams* and

than to any state version of the Code. However from the facts as described in *AES Tech-* *nology* it appears that Illinois law was applicable.

*V–M Corp.* and *AES Technology Systems* are inconsistent, *Adams* is controlling as to the question presented here.[6]

■ *Adams* plainly requires that Honeywell's motion be denied. Honeywell's argument is essentially that as a matter of law the validity of an exclusion clause is unaffected by the fact that a limited remedy has failed of its essential purpose. That contention was rejected by *Adams*, a case in which failure of a limited remedy's essential purpose was held to permit recovery of consequential damages notwithstanding an express clause excluding any such recovery. *Adams* cannot be distinguished on its facts:[7] Plaintiffs in this case *could* prove facts that, under the law announced in *Adams*, would plainly justify disregard of the exclusion clause.

Even if, despite the above discussion, *V–M Corp.* and *AES Technology Systems* were viewed as controlling declarations of Illinois law, they would not mandate a different outcome on this motion for summary judgment. In order to prevail Honeywell must demonstrate as a matter of law—in other words, either in all factual circumstances or on the *uncontroverted facts*— that its exclusion clause would be unaffect-

ed by a "failure of the essential purpose" of the limited remedy clause. In *V–M Corp.* the Court said that on the facts before it "we cannot say that the defects in the quality of [plaintiff's] ... goods caused a failure of consideration ... which would justify altering the particular allocation of [the] ... costs [agreed to by the parties]. ... We see nothing *in this record* to justify protection of the distributor's profits or expenditures at the expense of the manufacturers" (447 F.2d at 869, emphasis added). Similarly in *AES Technology Systems* the Court stated, "An analysis to determine whether consequential damages are warranted must carefully examine the individual factual situation involved. ... The intent of the parties, as gleaned from the express provisions *and the factual background*, was for AES to bear the risk of the project" (583 F.2d at 941, emphasis added).

Both decisions thus leave open the prospect that factual circumstances may permit an award of consequential damages where a limited remedy has failed its essential purpose, notwithstanding an exclusion clause.[8] Such factual issues may not of course be resolved on a motion for summary judgment.

6. Neither side has identified, nor has this Court found in its own research, an applicable Illinois Supreme Court case, which of course would prevail over *Adams* and the Seventh Circuit cases. Even if this Court were to employ the alternative Supreme Court-predictive approach to ascertaining Illinois law (see *In re Air Crash Disaster*, 644 F.2d 594, 605–606 (7th Cir. 1981)), it would still view *Adams* as representing the applicable law. *V–M Corp.* and *AES Technology Systems* did not purport to predict how the Illinois Supreme Court would decide the issue, nor did they draw even inferential support from decisions of that or other Illinois courts. Under those circumstances this Court must with all due respect view the Illinois Appellate Court's decision as a more reliable predictor than the decisions of non-Illinois courts as to what result the highest Illinois court would reach.

7. Honeywell completely ignored *Adams* in both memoranda it submitted in support of its motion, even though plaintiffs discussed the *Adams* decision at length in their memorandum in opposition. Honeywell did seek to rely on *Adams Laboratories, Inc. v. Jacobs Engineering*

*Co.*, 486 F.Supp. 383 (N.D.Ill.1980). But the *Adams Laboratories* court expressly recognized (486 F.Supp. at 388) that its facts were distinguishable from those in *Adams*. In addition, the material facts of this case—specifically the relevant contractual provisions—are nearly identical to those in *Adams* but critically different from those in *Adams Laboratories*. Accordingly Honeywell's reliance on *Adams Laboratories* is misplaced. That case in no way undermines the vitality or applicability of *Adams*.

8. Contrast *Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir. 1980) (New Jersey law), a decision directly supporting Honeywell's argument (as the Seventh Circuit decisions do not). *AES Technology's* conclusion was carefully limited (583 F.2d at 941, emphasis added): "However, we reject the contention that failure of the essential purpose of the limited remedy *automatically* means that a damage award will include consequential damages."

## 2. *Sections 2–302(1) and 2–719(3): Unconscionability*

Honeywell also seeks to establish that the exclusion clause is not unconscionable. In light of this Court's ruling in the preceding section of this opinion, a determination favorable to Honeywell on the unconscionability issue would not affect the outcome of its present motion. But because disposition of the issue at the present juncture may expedite further proceedings, the Court will discuss the proper scope of the unconscionability defense under the circumstances of this case.

Section 2–719(3) states, "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Section 2–302(1) is the general unconscionability provision of the Code:

If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Plaintiffs claim the exclusion clause is unconscionable because "Honeywell's conduct in this case was oppressive and worked an unfair surprise on Keating and KKO . . . ." They argue that "Honeywell, in a position of superior knowledge, chose to conceal the defect [the allegedly contaminated E and I magnets used in new contactors] . . . and knowingly permit a dangerous product to be used. To permit Honeywell to flagrantly breach its warranty and now attempt to ignore with impunity the severe losses inflicted on . . . [plaintiffs] is manifestly unconscionable."

Those assertions, essentially sounding in fraudulent concealment (and to that extent actionable under appropriate tort theories), are not at all relevant to the question whether the exclusion clause is unconscionable. Section 2–302(1) addresses a wholly different consideration from that raised by plaintiffs. As stated by the Illinois Appellate Court in *Neal v. Lacob*, 31 Ill.App.3d 137, 142, 334 N.E.2d 435, 439–40 (1st Dist. 1975):

Traditionally an unconscionable bargain has been one "which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept on the other. . . ." The term is used to signify a contract that is totally one-sided or oppressive. . . . In the context of dealings between businessmen, the unconscionability doctrine has been applied to protect those in need of goods or services from being overreached by others who have the power to drive hard bargains. . . .

That view, under which "unconscionability" relates to the use of bargaining position or power to command an inherently unfair contract, is confirmed by the Official Comment to Code Section 2–302:

The basic test is whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one sided as to be unconscionable under the circumstances at the time of the making of the contract.

■ Although plaintiffs have argued vigorously that Honeywell's conduct in this matter was deceitful, fraudulent and in violation of its obligations under the warranty clause, they have all but ignored the factual issue critical to unconscionability claims: the relative bargaining positions of the parties and the consequences of those relative strengths when the contract was entered into. Honeywell, on the other hand, has amply supported its contention that the contract between it and plaintiffs was entered into under fair circumstances by unconscionability standards. Plaintiffs have been in the business of manufacturing and selling commercial cooking equipment for over forty years and are among the largest manufacturers and distributors of fryers in the country. Competitive brands of contactors were available. Most importantly, nothing in the process by which plaintiffs agreed to purchase contactors from Honeywell suggests "overreaching" or any other

pressure tactics, and the resulting contract is at the least facially a fair one.[9]

*Adams Laboratories* considered a similar question. Plaintiff there alleged that defendant had fraudulently induced it to enter into their contractual relationship and, based on that claim, argued that an exclusion provision in the contract should be disregarded. Plaintiff's argument was rejected (486 F.Supp. at 388):

> Fraudulent inducement would form the basis for rescinding this limitation [the exclusion clause] if the fraud related directly to the plaintiff's acceptance of the provision.... Such is not the case here. Thus, although the alleged fraudulent inducement might entitle plaintiff to damages irrespective of the contract, it does not empower the plaintiff to enforce certain provisions of the contract which are to its liking and excise the rest.

Plaintiffs' allegations of fraudulent concealment stand on analogous ground in relation to their unconscionability argument. Because plaintiffs have not raised any other claims demonstrating alleged unconscionability of the exclusion clause, there are no issues of material fact as to that contention and Honeywell is entitled to a ruling in its favor on the issue as a matter of law.

### Conclusion

Honeywell's motion for summary judgment is denied. However the Court finds that there is no genuine issue as to any material fact bearing on the question whether the contract between Honeywell and plaintiffs is "unconscionable" within the meaning of Code Section 2–719(3). Accordingly the Court concludes that Honeywell is entitled to a determination as a matter of law that the contract is not unconscionable.

---

**9.** Indeed Section 2–302(1) requires that unconscionability be measured "at the time [the contract] was made." Much of plaintiffs' unconscionability argument is predicated on Honeywell's alleged post-contract conduct.