**INTERLAKE PACKAGING
CORPORATION,
Plaintiff,**

v.

**STRAPEX CORPORATION, Defendant.**

No. 93 C 0066.

United States District Court,
N.D. Illinois, E.D.

Dec. 20, 1993.

Jeffrey Blane Lieberman, Ray G. Rezner, Mark Scott Bernstein, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, for Interlake Packaging Corp.

Kenneth T. Kristl, Winston & Strawn, Brian Adam Bosch, Gary W. Garner, Warren von C. Baker, Daniel James Sheridan, Gard-

ner, Carton & Douglas, Chicago, IL, for Strapex Corp.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Plaintiff Interlake Packaging Corporation brings this three count complaint alleging breach of contract, tortious interference with contract, and unjust enrichment. Defendant Strapex Corporation has filed a counterclaim in which it alleges breach of contract and seeks a declaratory judgment that it rightfully terminated the parties' agreement. Presently before this court is Interlake's Motion for Partial Summary Judgment on Count I (Breach of Contract) of Strapex's counterclaim. For the reasons set forth below, we deny Interlake's motion.

### I. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991).

### Background

Plaintiff Interlake Packaging Corporation is a Delaware Corporation with its principal place of business in Illinois. Defendant Strapex Corporation is a North Carolina corporation with its principal place of business in North Carolina. Both companies manufacture and sr astic strapping material for use in pack, , and are business competitors. The present dispute involves a contract between the parties (the "Agreement").[1]

Beginning in late 1989, Strapex and Interlake began discussing possible ways to share their distribution channels and production capabilities. These negotiations continued into March of 1991, when the parties met to consider a joint venture. Although the parties were unable to agree upon a joint venture, they began considering a supply agreement for plastic strapping. Soon thereafter, the parties reached an accord involving five different categories of polyester and polypropylene plastic strapping. Under the Agreement, Strapex was to manufacture the strapping, and, subject to price, delivery, and warranty, Interlake was to purchase specified amounts.[2]

The Agreement also considered the possibility that Interlake might not be able to purchase the minimum specified annual amounts of each type of material. Paragraph 2.4 of the Agreement provided for retroactive price increases in the event that Interlake failed to purchase the guaranteed quantities. This provision further stated:

The above price increases will be invoiced on a semi annual basis. They will only apply following [Strapex]'s ability to perform as to delivery and warranty as set out below. Such surcharges shall be the only remedy which [Strapex] shall have in respect of the failure of [Interlake] to buy the specified annualized volumes for any reason.

---

1. The Agreement was actually negotiated and entered into by predecessors of each of the parties in the present lawsuit. However, for simplicity's sake, we shall simply refer to Interlake and its predecessor, InterPower, as "Interlake," and to Strapex and its predecessor, Interstrap, as "Strapex."

2. Specifically, Interlake was to chase 1600 tons of PET, 600 tons of 700 Contrax, and 100 tons each of Jumbo coils and AMS embossed machine quality strap.

In the purchases that followed the signing of the agreement, Interlake fell far short of the minimum promised annual amounts. Considering the entire nineteen month period from the signing of the agreement on May 10, 1991, to December 31, 1992, Interlake's purchases were as follows: less than 8.81% of the promised 1600 tons of PET, less than .378% of the promised 600 tons of 700 Contrax, less than 30% of the promised 100 tons of Jumbo coils, and less than 15.91% of the promised tons of AMS embossed machine quality strap. In January, 1993, Interlake filed this lawsuit against Strapex, asserting, among other things, that Strapex failed to supply the amounts and varieties of strapping material covered under the Agreement. Strapex counterclaimed, alleging in Count I that Interlake failed to order the minimum annual amounts of each variety, and seeking approximately $2.5 million in damages.[3] Interlake moved for summary judgment on Count I of the counterclaim, asserting that Strapex's remedy is proscribed in Paragraph 2.4, and that under that provision, Strapex must send Interlake an order shortfall notice before it becomes entitled to damages. Even then, Interlake asserts, Strapex may only recover damages as calculated under Paragraph 2.4.

### III.  Discussion [4]

■ In responding to Interlake's motion for summary judgment, Strapex's core assertion is that the remedy provided for in Paragraph 2.4 should not apply in the circumstances present here. Strapex's primary argument arises out of Section 2–719 of the Uniform Commercial Code ("U.C.C."), which generally permits parties to limit or modify remedies otherwise available under the U.C.C. 810 ILCS 5/2–719(1).[5] However, that section further provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." 810 ILCS 5/2–719(2). As a result, where a limited remedy "fail[s] of its essential purpose," the aggrieved party may look to the traditional remedies included in the U.C.C. in calculating damages. Claiming that Paragraph 2.4 fails of its essential purpose in the present situation, Strapex asserts that it should not apply, and that traditional U.C.C. remedies should be available on its counterclaim.

■ Although "failure of essential purpose" is not defined in the U.C.C., the Official Comment to § 2–719 provides some guidance as to its meaning:

[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract.... [U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

Uniform Commercial Code Comment 1. Despite this guidance, the cases which apply the "failure of essential purpose" provision of the U.C.C. evidence a great deal of confusion as to what circumstances actually lead a limited remedy to fail of its essential purpose. *See* Jonathan A. Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section 2–719(2)*, 65 Cal.L.Rev. 28, 29–30 (1977). The typical case involving

---

3. Strapex calculated its damages without reference to Paragraph 2.4, based upon the contention that Paragraph 2.4 does not apply in these circumstances. The difference is dramatic: for example, Strapex estimates its damages from the PET orders alone, using remedies available under the Uniform Commercial Code, at $1,237,-244.00. Under Paragraph 2.4, Strapex's damages for those same orders would be $25,645.62.

4. Although there is a choice of law issue in this diversity action, the parties have chosen to defer our consideration of whether Illinois or North Carolina law will apply, since the relevant law is apparently the same in both jurisdictions, and choice of law is therefore irrelevant here.

5. Although reference will be made generally to the U.C.C. throughout the course of our discussion, Illinois has adopted all of the relevant portions of the U.C.C. We will therefore provide citations to the Illinois Compiled Statutes Annotated for all U.C.C. sections discussed.

application of this U.C.C. section is one in which the contract limits the remedy of the buyer to repair or replacement of a malfunctioning or non-functioning item. In such a case, the "failure of essential purpose" provision is invoked when the seller is either unwilling or unable to make the product at issue conform to the contract. *See, e.g., Custom Automated Machinery v. Penda Corp.,* 537 F.Supp. 77, 83 (N.D.Ill.1982); *AES Technology Systems, Inc. v. Coherent Radiation,* 583 F.2d 933, 939 (7th Cir.1978).[6] Even though the contract specifically limits the remedies to repair and replacement, and even though the parties could or should have recognized that it might not be possible to repair or replace the goods at issue, the U.C.C. excuses the parties from compliance with the limited remedy. This is because the type of breach that occurs is not the type contemplated by the parties in agreeing to the limited remedy. *See AES,* 583 F.2d at 940; *Dowty Communications, Inc. v. Novatel Computer Sys. Corp.,* 817 F.Supp. 581, 585 (D.Md.1992). That is, the essential purpose of every limited remedy is, at core, to provide a remedy for the type of breach(es) envisioned by the parties in agreeing to the limited remedy. *See Dowty,* 817 F.Supp. at 585 ("[The court is] to assess the potential breaches envisioned by the parties when they agreed to limit their remedies and then to compare the actual breach to the parties' initial expectations. If the expectations and reality are materially the same, the remedial limitation should be enforced.").

Although we are not faced with a "repair and replacement" restriction here, the present situation is analogous enough to arguably warrant application of U.C.C. § 2–719(2).[7]

The facts support an inference that the actual breach which occurred was not contemplated by the parties in agreeing to Paragraph 2.4, and that the provision thus fails of its essential purpose. Strapex asserts that its purpose in entering into the Agreement with Interlake was to insure that Strapex would have a large guaranteed sales volume for its strap and other products. Furthermore, it contends that, at the time of the Agreement, Interlake intended to purchase all of the strap required under the agreement, and that Interlake's own records indicate that, in a worst case scenario, Interlake would be able to order between 92% and 95% of the guaranteed amounts. The remedy outlined in Paragraph 2.4 was thus designed to encourage Interlake to purchase 100% or more of the minimum agreed quantity of strap, rather than face the price increase that would result from falling just short of that amount. It would also allow Interlake to breach the contract in the event that it was simply unable to purchase the final five to eight percent of strap, but limit the resultant penalty. However, Strapex contends that the parties did not contemplate a circumstance in which Interlake would order virtually no strap, as is the case here.[8]

■ It is well established that "[c]ourts must peer into the particular factual circumstances of each case to determine if indeed the contract met its purpose." *AES,* 583 F.2d at 939. Construing all facts and inferences in Strapex's favor, as we must, we conclude that there in fact exists a genuine issue as to whether the provision failed of its essential purpose. We are therefore unable to grant Interlake's motion for summary judgment.[9]

---

**6.** It is irrelevant whether the seller's failure was willful or not. *See Custom Automated Machinery,* 537 F.Supp. at 83; *AES,* 583 F.2d at 939 n. 6.

**7.** We, of course, need not determine whether the limited remedy *actually* failed of its essential purpose, since it is sufficient for the purposes of this motion that there merely exist a genuine issue with respect to that question.

**8.** Strapex's contention in this regard is also supported by common sense. Under Paragraph 2.4, if the remedy provision were intended to apply in all circumstances, Strapex's damages would de-

crease, rather than increase, the less strap Interlake purchased. As a result, if Interlake totally breached, and purchased no strap, Strapex's damages under Paragraph 2.4 would be $0. This sort of anomalous result is clearly disfavored under the U.C.C. In the present case, where Interlake purchased as little as .378% of the required amount of one type of strap, we are unwilling to find, as a matter of law, that Paragraph 2.4 provides "minimum adequate remedies" or "a fair quantum of remedy."

**9.** Given this conclusion, we need not reach Strapex's assertions that the limited remedy provi-

## IV. Conclusio

For the reasons set forth above, we deny Interlake Packaging Corporation's motion for summary judgment. It is so ordered.

**Robert GROSSMAN, Pl  ntiff,**

v.

**MINNESOTA MUTUA  LIFE INSURANCE COMPANY, a corporation, Defendant.**

**No. 93 C 5464.**

United States District Court, N.D. Illinois, E.D.

Dec. 21, 1993.

David John Heyer, William J. Turner, Marvin A. Brustin, Charles E. Webster, Law Offices of Marvin A. Brustin, Chicago, IL, for plaintiff.

Catherine A.T. Nelson, Michael C. O'Neil, Jonathan G. Bunge, Keck, Mahin & Cate, Chicago, IL, for defendant.

---

sion was not intended to be an exclusive remedy and that Interlake acted in bad faith.