CUSTOM AUTOMATED MACHINERY, a Division of Custom Aluminum Products, Inc., Plaintiff-Counter Defendant,

v.

PENDA CORPORATION, Defendant-Counter Plaintiff.

PENDA CORPORATION, Plaintiff,

v.

CUSTOM AUTOMATED MACHINERY, Defendant.

Nos. 79 C 1755, 79 C 3078.

United States District Court, N. D. Illinois, E. D.

Jan. 20, 1982.

Paul Frenz, McBride, Baker, Wienke & Schlosser, Oak Brook, Ill., for plaintiff-counter defendant.

William F. Conlon, Sidley & Austin, Chicago, Ill., for defendant-counter plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ASPEN, District Judge:

This cause having come on trial and the Court, having considered the evidence, oral arguments, and the briefs of the parties, does hereby make and enter, pursuant to Rule 52 of the Federal Rules of Civil Procedure, its Findings of Fact and Conclusions of Law. Any finding of fact which is properly a conclusion of law and any conclusion of law which is properly a finding of fact is to be so considered.

## FINDINGS OF FACT

1. Custom Automated Machinery ("Custom") is an operating division of Custom Aluminum Products, Inc., an Illinois corporation with its principal place of business at 414 West Division Street, South Elgin, Illinois. Custom was established as a division of Custom Aluminum Products, Inc. on or about March, 1978. Custom designs, manufactures and sells thermoforming machinery. (Agreed Statement of Fact, hereinafter "ASOF", # 1).

2. Penda Corporation ("Penda") is a Wisconsin corporation with its principal place of business at 1214 North Fort Road, Portage, Wisconsin. Penda is in the business of thermoforming plastic products. (ASOF # 2).

*Case No. 79 C 3078: CAM No. 1*

3. In early 1978, the president of Penda met with a sales representative of Custom in Chicago, Illinois. They agreed to meet again in Wisconsin to discuss the possible purchase by Penda of thermoforming machinery manufactured by Custom. (ASOF # 3).

4. Subsequently, two meetings were held between Penda and Custom representatives at Penda plants in Wisconsin. During these meetings, Penda and Custom discussed the capacities of Custom's thermoforming machinery. Custom estimated that its machine would operate at a cycle time of 120 cycles per hour and stated that it could be delivered to Penda within eight to twelve weeks. (Tr. 90–94, 127).

5. Following these meetings, Custom sent Penda a written quotation for Penda's purchase of one 6' × 10' four-station rotary thermoforming machine (hereinafter "CAM No. 1") (ASOF # 4, Tr. 111–114). Custom stated therein that CAM No. 1 would have twin-sheet forming capability (Tr. 232) and would be accompanied by instruction manuals (Tr. 35; Penda Ex. 2).

6. Upon review of Custom's quotation for CAM No. 1, Penda representatives discovered that several operating requirements to which Custom had orally agreed were not included. Consequently, Penda retyped the aforementioned quotation, adding the operating requirements agreed to earlier as well as a few minor additional ones, and sent it to Custom on or about May 18, 1978. (Tr. 119–122).

7. In deciding to purchase CAM No. 1, Penda relied upon Custom's representations that the machine would be delivered within twelve weeks of the agreement and that the machine would be designed so that it could operate at 120 cycles per hour with an Envirodisc mold. (Tr. 90–94, 122–124).

8. Custom agreed to all of Penda's additions on the quotation for CAM No. 1.

9. In or about November, 1978, CAM No. 1 was delivered to Penda's plant in Portage, Wisconsin. (ASOF # 8).

10. CAM No. 1 was installed at Penda's plant by employees and agents of Custom in or about mid-November, 1978. (ASOF # 9).

11. Penda paid to Custom the full purchase price of $109,464.00 for CAM No. 1. (ASOFs # 7 and # 10).

12. Despite repeated requests by Penda, Custom failed to deliver to Penda manuals for the operation, start-up, and maintenance of CAM No. 1. (Tr. 190–91, 248).

13. During the installation of CAM No. 1, numerous problems with the machine were discovered. The problems with the installation of CAM No. 1 testified to at trial included misalignment of the platens, a defective sheet load table, and improper fan location. (Tr. 242–43). After CAM No. 1 was installed, Penda personnel attempted to operate it but encountered a series of mechanical failures and breakdowns. The plaintiff presented specific evidence of malfunctions, including shorts in the wiring, sagging frames, and burned-out motors. (Tr. 250–253). Additionally, the evidence established that CAM No. 1, as manufactured by Custom, is incapable of twin-sheet forming. (Tr. 615–616).

14. Penda personnel discussed the problems of CAM No. 1 with Custom personnel on numerous occasions and, on November 20, 1978, Penda formally notified Custom in writing of the malfunctioning of CAM No. 1. (Tr. 143–145, ASOF # 18).

15. Despite Custom's numerous service calls to work on CAM No. 1 between November, 1978 and March, 1979, Custom failed to repair the machine so that it could operate in accordance with Penda's needs. (Tr. 145–154, 263, 370–389, 860–875). After March of 1979, Custom did not perform any further repairs on, CAM No. 1, nor did it provide any further replacement parts. (ASOF # 19).

16. The testimony presented at trial indicated that CAM No. 1, as designed and manufactured by Custom, under the contract description for the machine, was not fit for the ordinary purposes of thermoforming machinery.

17. In an effort to correct the defects that Custom had failed to correct and to repair CAM No. 1 so that it could operate in accordance with Penda's needs, Penda sought assistance and parts from private contractors, at a cost of approximately $67,566, (Tr. 298)[1] and used parts from its inventory at a cost of approximately $500 (Tr. 309).

18. It would cost Penda at least $50,000 to modify CAM No. 1 so that the machine will be able to function in the twin-sheet forming mode (Tr. 616).

19. Due to the abnormal defects, CAM No. 1 was inoperative for 529 hours between May 30, 1979, and May 31, 1981.[2] Penda showed to a reasonable certainty that it suffered damages for loss of use of the machine in the amount of $43 per hour: $20 for lost operator time and $23 for profit. (Tr. 303–304). Penda also attempted to show an additional loss of $45 per hour for overhead costs. Penda's proof of this loss,

however, was wholly inadequate. (*See* Conclusion of Law # 15, *infra*).

20. The evidence at trial indicated that Penda lost 1,534 hours of CAM No. 1's productive capacity due to the machine's failure to consistently operate at 120 cycles per hour, 1,343 hours between January 25, 1979 to April 7, 1980 (Tr. 290–293) and 191 additional hours between April 27, 1980 and May 31, 1981 (Tr. 295).

21. The evidence at trial indicated to a reasonable certainty that Penda's maintenance employees spent 529 hours, at a cost of $18 per hour in repairing CAM No. 1 between May 30, 1979 and May 31, 1981. (Tr. 304–305).

*Case No. 79 C 1755: CAM No. 2*

22. After an agreement had been reached for Penda's purchase of CAM No. 1, the president of Penda spoke with a sales representative of Custom concerning the purchase of a second thermoforming machine. (Tr. 131–132).

23. Subsequent to this conversation, Penda submitted a purchase order, dated August 4, 1978, for the purchase of a second 6′ × 10′ four-station rotary thermoforming machine (hereinafter, "CAM No. 2"). (ASOF # 7). Attached to the purchase order for CAM No. 2 was a list of specifications, prepared by Penda which, except for the deletion of all references to twin-sheet forming capability, were identical to those in the May 18, 1978 agreement for CAM No. 1. (Tr. 133–135).

24. Pursuant to the terms of the purchase order for CAM No. 2, the machine was to be delivered to Penda within twelve

---

1. The record indicates that Penda spent $112,611 on private contractors for both CAM No. 1 and CAM No. 2. Penda estimated at trial that sixty percent of this amount—$67,566—was attributable to CAM No. 1 and forty percent to CAM No. 2.

2. At trial, Penda's witnesses testified that CAM No. 1 was down for 582 hours due to defects. In its post-trial brief, Custom argued that only 455 hours could be said to be due to defects in the machine. The Court has found that the defects in CAM No. 1 caused the machine to be down for 529 hours, and, thus, has excluded

hours from Penda's list of downtime hours on the following dates and shifts:

| | | | |
|---|---|---|---|
| 7/20/79 – Shift I | (1.66 hours) | 7/14/80 – Shift III | (.83 hour) |
| 11/14/79 – Shift I | (2 hours) | 7/23/80 – Shift III | (3 hours) |
| 11/21/79 – Shift I | (2.25 hours) | 7/24/80 – Shift III | (1 hour) |
| 12/07/79 – Shift II | (1 hour) | 8/25/80 – Shift II | (4.75 hours) |
| 12/19/79 – Shift I | (5.75 hours) | 10/19/80 – Shift III | (2.75 hours) |
| 1/20/80 – Shift III | (2 hours) | 12/08/80 – Shift III | (.66 hour) |
| 1/21/80 – Shift II | (1 hour) | 12/13/80 – Shift I | (3.5 hours) |
| 4/15/80 – Shift I | (.5 hour) | 2/27/81 – Shift II | (.5 hour) |
| 4/29/80 – Shift I | (4.5 hours) | 3/06/81 – Shift II | (2 hours) |
| 3/01/80 – Shift III | (7.35 hours) | 3/13/81 – Shift II | (.5 hour) |
| 5/02/80 – Shift I | (4 hours) | 5/06/81 – Shift II | (.5 hour) |
| 5/23/80 – Shift II | (1 hour) | | |

weeks of the date Custom received the purchase order, but in no event later than October 20, 1978. (Pl. Ex. 3). In addition, the agreement provided that instruction manuals would be delivered with the machine. (Tr. 35).

25. On or about January 3, 1979, CAM No. 2 was delivered to Penda's plant in Portage, Wisconsin. (ASOF # 13).

26. CAM No. 2 was installed at Penda's plant by Custom personnel in or about mid-January, 1979. (ASOF # 14).

27. The total purchase price for CAM No. 2 was $102,000.00. Penda has paid to Custom $66,000.00 towards the purchase price, but has withheld payment of the remaining $36,000.00. (ASOFs # 12, # 15, and # 16).

28. Despite repeated requests by Penda, Custom failed to deliver manuals for the operation, start-up, and maintenance of CAM No. 2. (Tr. 36–38, 248).

29. When CAM No. 2 was delivered to the Penda plant, several parts of the machine were missing or damaged. (Tr. 161–162).

30. In early February, Penda sent Custom a list of problems it had encountered with CAM No. 2 (Tr. 262). A meeting at Penda's plant between Penda and Custom personnel was held thereafter. (Tr. 262). On or about March 29, 1979, Penda sent to Custom a letter outlining the continuous malfunctioning of CAM No. 2. (Tr. 159–160).

31. Penda notified Custom orally and in writing that it considered Custom to have breached the August 1978 agreement. Penda made partial payment to Custom under a reservation of rights and notified Custom that it would not pay the balance until the machine was working properly. (ASOF # 18, Tr. 161–168, Pl. Ex. 20).

32. Despite Custom's numerous service calls to work on CAM No. 2 between January and March 1979 (Tr. 820–830), it failed to repair the machine to operate in accordance with Penda's needs. (Tr. 166–167, 263). After March of 1979, Custom did not perform any further repairs on, nor provide any further replacement parts for, CAM No. 2. (ASOF # 19, Tr. 59–60).

33. The testimony presented at trial indicated that CAM No. 2, as designed and manufactured by Custom, under the contract description for the machine, was not fit for the ordinary purposes of thermoforming machinery.

34. In an effort to correct the defects that Custom had failed to correct and to repair CAM No. 1 so that it could operate in accordance with Penda's needs, Penda sought assistance and parts from private contractors, at a cost of approximately $45,-044 [3] (Tr. 296–297) and used parts from its inventory, at a cost of approximately $500. (Tr. 309).

35. Due to abnormal defects, CAM No. 2 was inoperative for 506 hours between May 30, 1979 and May 31, 1981.[4] Penda showed to a reasonable certainty that it suffered damages for loss of use of the machine in the amount of $43 per hour: $20 for lost operator expense and $23 for profit. (Tr. 307). Penda's attempt to show an additional loss of $45 per hour in overhead costs was wholly inadequate. See Conclusions of Law # 10 and # 21, infra.

---

3. Forty percent of the $112,611 referred to in note 1.

4. At trial, Penda's witnesses testified that CAM No. 2 was down for 585 hours due to defects. In its post-trial brief, Custom argued that only 440 hours could be said to be due to defects in the machine. The Court has found that the defects in CAM No. 2 caused the machine to be down for 506 hours, and, thus, has excluded hours from Penda's list (Summary of Thermoforming Report) on the following dates and shifts:

| | | | |
|---|---|---|---|
| 6/04/79 – Shift III | (3.5 hours) | 12/19/79 – Shift I | (8 hours) |
| 7/19/79 – Shift II | (6 hours) | 1/15/80 – Shift II | (.75 hour) |
| 7/19/79 – Shift II | (8 hours) | 2/22/80 – Shift I | (.5 hour) |
| 7/26/79 – Shift II | (.5 hour) | 2/27/80 – Shift I | (1.25 hours) |
| 9/06/79 – Shift I | (2.5 hours) | 2/27/80 – Shift II | (3.75 hours) |
| 9/20/79 – Shift III | (1.6 hours) | 3/27/80 – Shift II | (5 hours) |
| 9/26/79 – Shift I | (.5 hour) | 5/30/80 – Shift II | (.5 hour) |
| 11/06/79 – Shift II | (7 hours) | 6/05/80 – Shift II | (2 hours) |
| 11/21/79 – Shift II | (1.5 hours) | 10/20/80 – Shift II | (7 hours) |
| 11/26/79 – Shift I | (1.4 hours) | 10/31/80 – Shift II | (.5 hour) |
| 12/13/79 – Shift II | (7 hours) | 5/13/81 – Shift II | (2.5 hours) |
| 12/14/79 – Shift I | (8 hours) | | |

36. The evidence at trial indicated to a reasonable certainty that Penda's maintenance employees spent 506 hours at a cost of $18 per hour in repairing CAM No. 2 between May 30, 1979 and May 31, 1981. (Tr. 308).

## CONCLUSIONS OF LAW

*Case No. 79 C 3078: CAM No. 1*

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

2. As the Court's jurisdiction is grounded upon diversity of citizenship, Illinois law is applicable.[5]

3. The record does not evidence that Custom negligently designed or manufactured CAM No. 1.

4. Penda alleges five breaches of express warranties. First, it complains that Custom breached an express agreement to produce instruction manuals for the installation, operation and maintenance of CAM No. 1. Custom does not deny that its contract with Penda required it to provide such manuals upon delivery of the machine. Nor does Custom deny that it failed to provide these manuals until discovery proceedings in this litigation commenced. Rather, Custom asserts that its failure to provide the manuals was a non-material breach and that Penda has failed to prove damages therefrom. While Penda's proof of distinct damages [6] from Custom's failure to provide the manuals may have been inadequate, it is clear that Custom did breach this express warranty.

5. The second breach of express warranty alleged by Penda is late delivery of the machine. The parties agree that Custom was required to deliver the machine within twelve weeks; the dispute centers over the date from which the twelve weeks began to run. Penda contends that the twelve-week period should run from the date of Custom's receipt of Penda's revised quotation for CAM No. 1; *i.e.*, in late May of 1978. As the machine was not delivered until early November, the delivery would be significantly overdue under Penda's interpretation. Custom asserts, however, that the Court should look to Custom's receipt of a formal purchase order on September 28, 1978, just eight weeks prior to delivery. In support of its argument, Custom explains that not until September was a final financial arrangement arrived at. The Court finds that the parties intended the twelve weeks to run from May 1978. This construction is supported by Custom's act of beginning building of CAM No. 1 in July of 1978 (Tr. 734) and the notation on the invoice accompanying the September purchase order indicating delivery on October 2, 1978. (Tr. 224). Therefore, Custom's delivery of the machine was late.[7]

6. Custom's third alleged breach of express warranty is the failure of CAM No. 1 to operate at 120 cycles per hour. Custom does not deny that its representatives told Penda that CAM No. 1 would be able to perform at 120 cycles per hour. Custom does deny, however, that the statements of its representatives constitute an express warranty. It contends that the statement was merely the representative's "ball park" estimate, or opinion, and is, in any case, excluded by parol evidence rule. The Court disagrees. To state affirmatively that the machine would operate at 120 cycles per hour is a promise made by the seller relating to the goods and therefore is an express warranty under Ill.Rev.Stat. ch. 26, § 2–313. Unless a written document is determined to be the complete and exclusive statement of the terms of the agreement,

---

5. This Court's suggestion during trial that Wisconsin law would apply was based upon the Court's examination of conflict of law principles in light of the plaintiff's negligence claims. The parties agreed (Tr. 193–195), and this Court finds that there is no conflict between Illinois and Wisconsin law on any issue in this case other than the recovery of economic loss in negligence actions. Since the Court finds that Custom was not negligent, *infra*, we need not address conflict of law principles and the law of the forum applies.

6. The damage issues are dealt with *infra*.

7. Whether Penda has proven damages from this breach is a separate question, however, and is addressed *infra*.

the parol evidence rule does not exclude supplementing the writing with consistent additional oral terms. Ill.Rev.Stat. ch. 26, § 2–202. Notwithstanding the language therein excluding all oral agreements, the evidence does not support Custom's contention that the parties intended the September purchase order to be the exclusive statement of the agreement.

7. The fourth alleged breach of express warranty is Penda's claim that Custom expressly warranted that CAM No. 1 would have twin-sheet capability. The parties do not disagree that the machine was so warranted and the Court has found that the machine is incapable of twin-sheet forming. Thus, Custom has also breached this warranty.

8. Finally, Penda makes a general claim that CAM No. 1 did not conform with the machine specified in the contract, arguing that the machines are "virtually worthless." This argument is more appropriately made under the rubric of breach of implied warranty of merchantability. As Penda repeats this argument under that rubric, the Court finds no need to deal with it as an express warranty question.

9. An implied warranty of merchantability accompanies all goods sold by a merchant of goods of that kind unless expressly excluded or limited. Ill.Rev.Stat. ch. 26, § 2–314. To be merchantable, goods must be, *inter alia*, fit for the ordinary purposes for which such goods are used and passable without objection in the trade under the contract description. CAM No. 1 failed to meet these basic standards of merchantability. The Court, therefore, concludes that Custom breached its implied warranty of merchantability.

10. There are three prerequisites to the creation of an implied warranty of fitness for a particular purpose: (1) the seller must have reason to know of the particular purpose for which the buyer requires the goods, (2) the buyer must rely on the seller to select suitable goods, and (3) the seller must have reason to know of the buyer's reliance. Ill.Rev.Stat. ch. 26, § 2–313. All three prerequisites are satisfied in this case. The record shows that Custom knew of Penda's need for a machine that would operate at 120 cycles per hour with the Envirodisc mold; that Penda relied on Custom's skill in the manufacture of thermoforming machines to provide such a machine; and that Custom had reason to know of Penda's reliance. Custom's argument that Penda produced the technical specifications for the machine and thus did not rely on Custom is not supported by the evidence. Penda's additional specifications are merely a list of Penda's operational needs, which do not constitute the type of technical specifications that preclude implied warranties of fitness for a particular purpose. *See, Aluminum Co. of America v. Electric Flo Corp.,* 451 F.2d 1115, 1119 (10th Cir. 1971). The evidence shows that the implied warranty was breached by Custom.

11. Custom contends that, despite any breaches, Penda's remedies are contractually limited to repair and replacement of parts. There is no dispute that the contract contains a clause which provides that remedies are so limited and that Ill. Rev.Stat. ch. 26, § 2–719 allows parties to limit remedies. Nevertheless, the section also provides that "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act." Section 2–719(2). A limited remedy of repair and replacement fails of its essential purpose when it is inadequate to provide the buyer with goods which conform to the contract within a reasonable time. *AES Technology Systems, Inc. v. Coherent Radiation,* 583 F.2d 933, 939 (7th Cir. 1978); *Adams v. J. I. Case Co.,* 125 Ill.App.2d 388, 261 N.E.2d 1 (1970); *Murray v. Holiday Rambler, Inc.,* 83 Wis.2d 406, 265 N.W.2d 513 (1978). It is irrelevant to this standard whether the seller's failure to correct the defect is willful or not. *Murray,* 265 N.W.2d at 521. In the instant case, the record clearly evidences that Custom did not correct the defects in CAM No. 1 within a reasonable time. Therefore, the limitation of remedy clause fails of its essential purpose and full UCC remedies are available to Penda.

12. In order to avail himself of remedies under the UCC, a buyer who has accepted goods must notify the seller of any breaches within a reasonable time after he discovers or should have discovered such breach. Ill. Rev.Stat., ch. 26, § 2–607. There is no question but that Penda informed Custom on numerous occasions of the malfunctioning of CAM No. 1 shortly after delivery thereof. Indeed, written notification of the problems with CAM No. 1 was sent to Custom on November 20, 1978. The UCC does not require any particular type of notification in any particular words. *Murray v. Kleen Leen, Inc.*, 41 Ill.App.3d 436, 442, 354 N.E.2d 415 (1976). Official Comment 5 states that "[t]he content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." *See also AES Technology Systems*, 583 F.2d at 936. Of the troublesome nature of CAM No. 1, Custom was well informed.

■ 13. Ill.Rev.Stat. ch. 26, § 2–714 establishes the basic remedy for a buyer's damages in regard to accepted goods. Under this provision, the buyer is entitled to recover his losses resulting in the ordinary course of events from the seller's breach. Subsection (2) of Section 2–714 sets out the formula commonly used to quantify this loss: the difference at the time and place of acceptance between the value of the goods as accepted and the value of the goods if they had been as warranted. This difference in value can be computed by reference to the cost of repairing the goods so that they meet the warranty standards; *i.e.*, the difference in value between the goods as accepted and as warranted equals the cost of repairs.[8] White and Summers, Handbook of the Law Under the Uniform Commercial Code, 317 (2d ed. 1980).

■ 14. Penda's cost of repairing CAM No. 1 to operate as warranted is comprised of the following elements:

(a) maintenance employee time—$9,522 (529 downtime hours × $18/hour);[9]

(b) assistance and parts from outside contractors—$67,566;

(c) parts from Penda's inventory—$500; and

(d) addition of twin-sheet capability—$50,000.[10]

Thus, Penda is entitled to recover from Custom the amount of $127,588[11] as damages under Section 2–714 for its breach of the implied warranty of merchantability.

■ 15. Ill.Rev.Stat. ch. 26, § 2–715 allows for the recovery of incidental and consequential damages from the

8. The parties argue at some length about the recoverability of finance charges under this formula. As is clear from Penda's own calculations, however, finance charges are costs of the goods both as accepted and as warranted. Thus, the cost of financing nets out when one computes the difference between the value of the goods as accepted and as warranted.

9. Custom argues that Penda is not entitled to the cost of its maintenance employees' time because there is no evidence that Penda hired any additional maintenance personnel or required its regular employees to work overtime. But the cost of Penda's employees' time was part of the cost of repairing a machine that Penda would not have had to repair if it had operated as warranted. Therefore, the cost of maintenance employee time was part of the difference in value between the machine as accepted and as warranted to which Penda is entitled under Ill.Rev.Stat. ch. 26, § 2–714. Custom may not evade responsibility for a cost stemming from its breach simply because Penda used its own personnel rather than hiring outside maintenance people.

10. Penda has claimed a cost "in excess of $50,000" for adding twin-sheet capability to CAM No. 1. As Custom has presented no evidence suggesting that this estimate is incorrect, $50,000 damages will be awarded for the difference in value between a thermoforming machine with twin-sheet capability and one without. The fact that Penda has not in fact added twin-sheet capability to CAM No. 1—deciding instead to purchase another machine that had such capability—does not preclude its claim. Penda has the option to either recover the cost of the difference in value between the machine as constructed and as warranted or to replace the machine and recover the cost of replacement. *See* Ill.Rev.Stat. ch. 26, § 2–715, Illinois Comment 2; *Lutgert v. Schaeflein*, 318 Ill.App. 83, 47 N.E.2d 359 (1943).

11. While some portion of this sum may also be attributable to Custom's breach of its express warranty to provide instruction manuals, there is no evidence to support an allocation of damages for specific breaches.

breaching seller. Custom's argument that the limitation of remedies clause precludes all consequential damages as it shows that Custom had not agreed to them is without merit. As the court held in *Adams*—where a limitation of remedy to repair and replacement clause was also found to have failed of its essential purpose—a buyer need not show "a prior understanding or agreement that the seller be bound for consequentials damages in the event of breach" in order to recover consequentials. 125 Ill. App.2d at 406, 261 N.E.2d 1; *KKO, Inc. v. Honeywell*, 517 F.Supp. 892, 898 (N.D.Ill. 1981). Consequential damages include losses resulting from the buyer's general or particular requirements of which the seller had reason to know at the time of contracting. Section 2–715(2)(a). Penda claims the following as consequential damages: [12]

(a) lost productive capacity during machine's downtime—582 hours (downtime hours) × $68 ($45 overhead plus $23 profit) per hour = $39,576;

(b) maintenance employee time—582 hours × $18 per hour = $10,476;

(c) lost productive time of operators during machine's downtime—582 hours × $20 per hour = $11,640;

(d) assistance and parts from outside contractors—$64,566.60

(e) lost productive capacity due to machine's inability to operate at 120 cycles per hour—1,534 hours (hours lost) × $68 per hour ($43 overhead plus $23 profit) = $104,312;

(f) lost management time due to defects in CAM No. 1—$8,500

(g) lost profits on lost contracts—$91,-911.76; and

(h) parts from Penda's inventory—$500.

Only Items (a), (c), and (e) are recoverable as consequential damages.[13] All are reduced in amount, however, to take account of Penda's errors in calculating the downtime hours of CAM No. 1 [14] and this Court's

**12.** Although Penda did not separate the damages it seeks under Sections 2–714 and 2–715, we do so for purposes of clarity. *See* White & Summers, Handbook of the Law Under the UCC 386 (2d ed. 1980).

**13.** The claims for Items (b), (d), and (h) are rejected under Section 2–715 as duplicative of the damages allowed under Section 2–714 for the difference in value between the machine as warranted and as accepted. While these costs of repair may be sought as consequentials under Section 2–715 instead of under Section 2–714, they may not be recovered under both. *See*, White & Summers, Handbook of the Law Under the UCC 386 (2d ed. 1980).

As to claims for lost management time (Item f) and profits (Item g), Penda has failed to provide the requisite proof to recover these amounts. Proof that damages have been suffered must be made "by credible evidence to a reasonable certainty" and the amount of the damages must be proven "at least to a reasonable probability." *Murray*, 265 N.W.2d at 526. Penda's evidence that contracts with Chevrolet and Ford were lost due to the late delivery of CAM No. 1 failed to meet this burden of proof, since Penda established neither the amount of lost profits nor that it would have been able to perform those contracts even if the machine had been timely delivered.

Moreover, despite Penda's attestations at trial on the importance of delivery time, the contract between Penda and Custom allocated the risk of late delivery to Penda. If Custom had

provided adequate repair services such that the limitation of remedies clause was effective, Penda would not be entitled to any damages for Custom's late delivery. While this Court has held that the limitation of remedy clause fails of its essential purpose and Penda may therefore seek other remedies, consequential damages are not automatically awarded. Where the limitation of remedies clause demonstrates that the parties have contractually allocated certain risks, that allocation may be effective even where the clause fails of its essential purpose, especially where the parties are of equal bargaining power. *AES Technology Systems, Inc. v. Coherent Radiation*, 583 F.2d 933, 942 (7th Cir. 1978); *V. M. Corp. v. Bernard Distributing Co.*, 447 F.2d 864, 869 (7th Cir. 1971). Thus, even if Penda's proof of damages from late delivery was adequate, this Court would not award such damages.

Penda's claim to $41,911.76 that it might have lost if one of its customers, Clow, had desired more goods, rests on far too many speculative assumptions to justify recovery.

The evidence presented on the cost of management time expended due to Custom's breach of warranty is also based on guesses and estimates and is not recoverable.

**14.** The Court has found that the number of downtime hours due to defects in CAM No. 1 caused by breach of warranties was 529 hours rather than the 582 hours claimed by Penda.

rejection of the claim for overhead costs.[15] Therefore, Penda is entitled to consequentials in the amount of $58,029.

*Case No. 79 C 1755: CAM No. 2*

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1).

17. Illinois law applies to this action. *See* Conclusion of Law # 2, *supra.*

18. Penda alleges three breaches of express warranty concerning CAM No. 2. First is Custom's failure to provide instruction manuals. Penda also alleges that CAM No. 2 was not delivered at the warranted delivery date. The facts show that the machine was delivered later than the time agreed by the parties; thus, there is a breach. The Court finds that these failures constitute breaches of Custom's express warranty. Finally, Penda alleges a general failure of the machine to meet contract specifications. This allegation will be treated under the rubric of implied warranty of merchantability. The record is replete with descriptions of the malfunctions and defects of CAM No. 2 which rendered the machine unfit for the ordinary purposes for which thermoforming machinery is used. Thus, Custom breached the implied warranty of merchantability that accompanied CAM No. 2.

19. Since Penda requests no damages stemming from breach of an implied warranty of fitness for a particular purpose, *i.e.*, cycle speed (Tr. 294), the Court need not reach the question of whether such a warranty existed or was breached.

20. The record does not establish that Custom negligently designed or manufactured CAM No. 2.

21. For the reasons discussed in Conclusion of Law # 9, *supra*, since Custom was unable to adequately repair CAM No. 2, the limitation of remedies to repair and replacement clause fails of its essential purpose and Penda is entitled to other remedies under the Commercial Code.

22. Custom was adequately notified pursuant to Ill.Rev.Stat. ch. 26, § 2–607, that Penda considered it to be in breach of the warranties accompanying CAM No. 2. Therefore, Penda may avail itself of the remedies applicable to a buyer who has accepted goods.

23. Ill.Rev.Stat. ch. 26, § 2–717 allows a buyer to deduct damages resulting from a breach of contract from the price still due on the contract when the buyer has so notified the seller. Penda's refusal to pay Custom the $36,000 balance due on CAM No. 2 falls within this provision. Custom argues that Penda was not entitled to rely on this provision because notice was given when the price was "overdue" rather than "still due." While Penda may not have explicitly told Custom that it was withholding the *$36,000 as damages* for Custom's breach, Custom unquestionably was notified that Penda was *withholding payment* because of that breach. Custom has failed to show that Section 2–717 requires anything further.

24. As discussed above in Conclusions of Law # 13, damages under Ill.Rev.Stat. ch. 26, § 2–714 are calculated by reference to the cost of repairs. Penda's cost of repairing CAM No. 2 so that it could operate as warranted is comprised of the following:

(a) maintenance employee time—$9,108 (506 downtime hours × $18/hour);

---

**15.** Penda has failed to substantiate its claim of $43 per hour for overhead costs. As overhead costs are sought for periods during which CAM No. 1 was not operating, the $43 figure clearly cannot represent the cost of running the machine. Penda's separate claim for the cost of operation and maintenance employees during the machine's downtime demonstrates that overhead does not stem from personnel expenses. The Court acknowledges that some portion of total plant operating costs normally would be recovered in the price of items produced by CAM No. 1 and that such recovery was precluded by the inoperability of the machine. But since Penda has failed to offer any evidence of general operating costs or the allocation of such costs to CAM No. 1, we can only speculate as to what such costs might be. While the Uniform Commercial Code does not require proof of damages with mathematical precision, Ill.Rev.Stat. ch. 26, § 1–106, more than speculation is necessary. Thus, Item (a) is reduced to $12,167 (529 hours × $23 per hour), Item (c) is reduced to $10,580 (529 hours × $20 per hour), and Item (e) is reduced to $35,282 (1,534 hours × $23 per hour).

(b) assistance and parts from outside contractors—$45,044; and

(c) parts from Penda's inventory—$500. For the reasons set forth in Conclusions of Law # 14, *supra*, Custom's argument against the award of maintenance employee time is rejected. Thus, Penda shall recover $54,652 from Custom under Section 2–714 for Custom's breach of its implied warranty of merchantability.[16]

25. Penda claims the following amounts pursuant to Ill.Rev.Stat. ch. 26, § 2–715 as consequential damages for Custom's breaches in regard to CAM No. 2:

(a) lost productive capacity during machine's downtime—585 hours (downtime hours) × $68 per hour ($45 overhead plus $23 profit) = $39,780;

(b) maintenance employee time—585 hours × $18 per hour = $10,530;

(c) lost productive time of operators during machine's downtime—585 hours × $20 per hour = $11,700;

(d) assistance and parts from outside contractors—$55,044.40;

(e) lost management time due to defects in CAM No. 2—$5,500; and

(f) parts from Penda's inventory—$500. Only Items (a) and (c) are recoverable as consequential damages.[17] These items are reduced, however, to take account of Penda's errors in calculating the downtime hours of CAM No. 2[18] attributable to abnormal defects Moreover, as with damages for CAM No. 1, and for the reasons given in Conclusion of Law # 10, Item (a) is further reduced by the amount attributable to "overhead costs."

Therefore, Penda is entitled to consequential damages in the amount of $21,758.

**16.** While some part of this amount may also be attributable to Custom's breach of its express warranty to provide instruction manuals, there is no evidence to support an allocation of damages for specific breaches.

**17.** The claims for Items (b), (d) and (f) are duplicative of the repair costs recovered under Ill.Rev.Stat. ch. 26, § 2–714 as the difference in value between the machine as warranted and as accepted. These costs may not be recovered twice.

## CONCLUSION

For the foregoing reasons, the Court finds that Custom breached the implied warranties accompanying CAM No. 1 and CAM No. 2 and is liable therefore in the amount of $185,617 for CAM No. 1 and $76,410 for CAM No. 2. Penda's recovery for in CAM No. 2 is reduced by $36,000, the balance owed to Custom for payment of the machine. Accordingly, judgment is entered for Penda in the amount of $226,027. It is so ordered.

As to the lost management time, Penda has failed to prove to a reasonable certainty that such damages were suffered and, to a reasonable probability, what those damages were.
Custom failed to prove that it is entitled under any rule of law to $8,343.59 for parts for CAM No. 2.

**18.** As the Court has found that the number of downtime hours was 506 rather than 585 hours, Item (a) is reduced to $11,638 and Item (c) is reduced to $10,120.